Nicholas W. Armstrong  (Cal Bar No. 270963)
Email: nick@pricearmstrong.com
PRICE ARMSTRONG, LLC
24121 2nd Avenue North, Suite 1
Birmingham, Alabama  35203
Tel:  (205) 208-9588
Fax: (205) 208-9598

Attorney for Plaintiff, individually and
on behalf of all others similarly situated

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| DALLAS R. RITTER,<br><br>         Plaintiff,<br><br>v.<br><br>SUPERIOR PERFORMERS, INC. d/b/a NAA INSURANCE AGENCY; ANDY SPENCER ALBRIGHT; and THE INDEPENDENT ORDER OF FORESTERS,<br><br>         Defendants. | CASE NO.: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Unlawful, Unfair and Fraudulent Practices (Cal. Bus. & Prof. Code §17200 *et seq.*);<br><br>2. Unfair, Deceptive, and Misleading Advertising (Cal. Bus. & Prof. Code § 17500 *et. seq.*);<br><br>**DEMAND FOR JURY TRIAL** |

- 1 -
CLASS ACTION COMPLAINT

1.      Plaintiff Dallas R. Ritter ("Plaintiff"), by and through his attorneys, brings this Complaint against Defendants Superior Performers, Inc., d/b/a NAA, NAA Insurance Agency and/or National Agents Alliance (collectively "NAA"), Andy Spencer Albright, and the Independent Order of Foresters (collectively "Defendants"), on behalf of himself and all other similarly situated persons who purchased a replacement life insurance policy from an NAA producer and/or who had their personal and privileged information disclosed by NAA as a sales lead. Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by and through his attorneys.

## INTRODUCTION

2.      Defendants have engaged in a widespread and coordinated scheme to unlawfully sell life insurance policies as replacements for other existing insurance policies owned by consumers. The illegal sales practice, known as "churning," was carried out throughout the state of California as part of a coordinated effort organized by the insurance marketing organization known as National Agents Alliance or NAA. NAA was comprised of hundreds of individual insurance producers (i.e., insurance agents) in California who formed business relationships with NAA and agreed to and did act under the direction and control of NAA's management, and specifically, Andy Spencer Albright ("Albright"), the President

- 2 -
CLASS ACTION COMPLAINT

and CEO of NAA and its network of producers. Albright and NAA aggressively recruited its individual producers with false promises of enormous wealth potential and built a pyramid marketing network that, in turn, aggressively sold life insurance policies throughout the state using unfair, unlawful and deceptive practices, including churning.

3.      The purpose of the scheme was and is to reap profits for all Defendants involved at the expense of the consumers. Those that profited included, in addition to NAA and Albright, the insurance companies who appointed the producers that sold the insurance companies' products using NAA's model. In the Plaintiff's case, the insurance company involved was the Independent Order of Foresters ("Foresters"), a fraternal benefit society that sells life insurance throughout the country, with California being its largest state by sales. NAA, Albright, and the NAA producers operating in California also churned clients using other life insurance company products in addition to Foresters' policies. The churning scheme was executed in a uniform and systematic manner. To carry it out, the Defendants used the policyholders' private and confidential information for the improper purpose of selling replacement policies.

4.      The effect of the Defendants' scheme was that Plaintiff and putative class members were advised to replace one life insurance policy with another by canceling, surrendering or exchanging an existing policy, and buying a new policy.

CLASS ACTION COMPLAINT

In so doing, the customers received a policy that was more expensive than the original policy. The customers also incurred additional and unnecessary costs associated with the replacement policies, and specifically, the front-end loaded administrative costs which they had already incurred in the original policies. The Plaintiff and putative class also lost the advantage of having the price of their premium based on the younger age they had at the time of the issuance of the original policy.

5.      The Defendants' unlawful, unfair, and deceptive acts and practices constitute a violation of Cal. Bus. & Prof. § 17200, et seq., and Cal. Bus. & Prof. § 17500, et seq. The scheme has been ongoing for years and poses the threat of continued harm.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005("CAFA") because: (1) "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," (2) the action is pled as a class action involving more than 100 putative class members, and (3) "any member of a class of plaintiffs is a citizen of a State different from any defendant."

CLASS ACTION COMPLAINT

## PARTIES

7.    Plaintiff Dallas R. Ritter is, and at all times relevant herein was, a citizen of the State of California, residing in San Bernardino County.

8.    Defendant NAA is a corporation organized and existing under the laws of the State of Virginia, with its principal place of business at relevant times at 1214 Turrentine Street, Burlington, North Carolina 27215. NAA is a licensee of the State of California Department of Insurance (License No. 0E44298). NAA conducted business and committed wrongful acts and omissions directly and through its affiliated producers, agents and employees.

9.    Defendant Albright owns and controls NAA. Albright is also licensed as a non-resident insurance producer in the state of California and has been since 2000. His license number is 0D03965. His business address is 1214 Turrentine Street, Burlington, North Carolina 27215.

10.    Defendant Foresters is, and at all times relevant herein was, an insurance company organized as a fraternal benefit society under the laws of Canada, domiciled in the State of New York, with its principal place of business in Don Mills, Ontario, Canada, and is authorized to transact the business of selling insurance in the State of California (California Company ID# 0517-3). Foresters, in fact, conducted substantial business in California as evidenced by its reported $35,064,969 in life insurance premiums received from California policyholders in

- 5 -
CLASS ACTION COMPLAINT

2014 alone. Foresters conducted business and committed wrongful acts and omissions, directly and through its appointed producers, agents and employees.

## CLASS ACTION ALLEGATIONS

11. Plaintiff brings this action as a class action and proposes a class and sub-classes of those persons who were harmed by Defendants' violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.) and California's False Advertising Law (Cal. Bus. 8. Prof. Code § 17500 et seq.). All information necessary to determine the class members and the damages those members suffered are in Defendants' possession or control.

12. The Class is defined as follows:

> all persons who reside or are located in the State of California who owned a life insurance policy that was replaced by another life insurance policy sold by an NAA producer on or before December 22, 2011.

The Plaintiff also defines as a sub-class:

> all persons who reside or are located in the State of California who owned a life insurance policy that was replaced by another life insurance policy issued by the Independent Order of Foresters and sold by an NAA producer on or before December 22, 2011.

The Plaintiff also defines as a sub-class:

> all persons who reside or are located in the State of California whose personal and/or privileged information was disclosed by

NAA as a current client lead on or before on or before December 22, 2011.

13.    For the purpose of this action, the term "NAA producer" is defined as any insurance producer licensed by the State of California who, at the time he or she sold a replacement policy to a class member, was also contracted or otherwise affiliated through an "Agent Agreement" or the like with Superior Performers, Inc., NAA, NAA Insurance Agency, and/or National Agents Alliance.

14.    Plaintiff excludes from the class any persons in bankruptcy or whose obligations have been discharged in bankruptcy, counsel of record, judicial officers, members of the judiciary, Defendants and their related persons, agents, employees, officers, and/or directors. Plaintiff maintains the right to create additional subclasses or classes, if necessary, and to revise the class definition to maintain a cohesive class that does not require individual inquiry to determine liability.

## Common Questions of Law and Fact Predominate

15.    There are common questions of law and fact of general interest to the class. These common questions of law and fact predominate over any questions affecting only individual members of the class. Included among the common questions are:

> a.    Whether Defendants' business practices were unlawful;
>
> b.    Whether Defendants' business practices were unfair;

- 7 -

c. Whether Defendants' business practices were deceptive;

d. Whether Defendants engaged in a widespread and systematic practice which led to Plaintiff and members of the putative class replacing existing life insurance policies with other life insurance policies sold by NAA producers;

e. Whether an injunction is necessary to keep Defendants from continuing to engage in the wrongful conduct alleged herein;

f. Whether Defendants' conduct as alleged herein is unconscionable;

g. Whether Defendants conspired to commit the wrongful acts alleged herein;

h. Whether Defendants engaged in unfair, deceptive or misleading advertising;

i. Whether Plaintiff and members of the putative class were damaged by Defendants' business practices;

j. Whether Plaintiff and members of the putative class were damaged by Defendants' misleading advertising;

k. Whether Defendants have ceased engaging in the wrongful conduct alleged herein; and

l. Whether the Defendants violated Cal. Ins. Code Sections, 780, 781, 791.03, 791.13, and/or 791.06, *et seq.*

## Typicality and Numerosity

16. The claims of the named Plaintiff are typical of the claims of the class. The total number of members of the putative class exceeds five hundred (500) members.

- 8 -

**Adequate Representation**

17.    The named Plaintiff will fairly and adequately protect the interests of the members of the class and has no interest antagonistic to those of other class members. Plaintiff has retained class counsel who are competent to prosecute class actions and are financially able to represent the class.

**Superiority**

18.    The class action mechanism is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all members of the class is impracticable. The class action mechanism provides the benefit of unitary adjudication, economies of scale and comprehensive supervision by a single court. The interests of judicial economy favor adjudicating the claims for Plaintiff and putative class members as a class rather than for Plaintiff and putative class members on an individual basis.

19.    Defendants have acted on grounds applicable to the class as a whole, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

**FACTUAL ALLEGATIONS**

**The Defendants' Churning Scheme**

20.    Superior Performers is an insurance marketing organization ("IMO") that operates under the name "National Agents Alliance." As an IMO, NAA serves as a middle-man between insurance companies and NAA's sales force of individual producers (i.e., insurance agents). NAA recruits producers and facilitates their licensing with state departments of insurance, as well as their appointments with insurance companies (i.e., contracting as agents). NAA also provides marketing and back-office support for the producers who contract with NAA. The marketing support is provided largely in the form of sales leads NAA sells to the producers who take the leads and contact individuals who have been identified by NAA as

- 9 -

potential insurance customers. The back-office support comes largely in the form of processing applications for insurance policies by sending completed applications to the insurance companies who will ultimately issue the policies sold by the NAA producers. With the affiliated insurance companies, NAA also provides training and supervision of sales practices.

21.     NAA is built on the multi-level marketing model and producers are strongly encouraged to recruit other producers to join NAA. A producer's revenue and income is dramatically impacted by the number of other producers included in his or her "up-line" or "down-line" hierarchy. As with most multi-level marketing schemes, the more down line producers a salesperson has in his hierarchy, the more income he will receive because a portion of each sales commission goes to everyone up-line from the person who makes the sale. Consequently, being at or near the top of a hierarchy (or pyramid) comprised of a large number of agents provides, in theory, a greater opportunity to make more money. NAA was created by Defendant Albright and he has positioned himself as the top of the NAA pyramid. In other words, and upon information and belief, Albright (or in some cases NAA) receives some amount of payment or commission for each sale made by all NAA producers.

22.     Despite this complex and intricate organizational structure, the producer's relationship with NAA is, according to NAA, one of independent contractor and does not constitute any relationship of employer and employee, franchisor and franchisee, partnership or joint venture between NAA and the producer. NAA producers are also uniformly trained and directed to identify themselves as agents of the life insurance company for whom they are selling, and to not identify themselves as an NAA producer.

23.     NAA, and presumably Albright, also receives substantial revenue from selling sales leads to NAA producers. Many of those leads are generated through

- 10 -

public record searches. By example, NAA agents sell a form of life insurance it markets as mortgage protection life insurance for the purpose of providing life insurance coverage to pay off the mortgage on a family's home should the homeowner who is the primary breadwinner die. Upon information and belief, NAA generates leads for this product line by reviewing public records evidencing the recordation of mortgages to obtain the names and addresses of potential customers.

24.    Another, and more dubious, lead generation method used by NAA is the "current client lead" program. This program is at the heart of the churning scheme. In it, NAA generates leads by doing systematic follow-up inquiries to current customers (i.e., customers who have previously purchased a life insurance policy from an NAA producer).

25.    Important to note is that a "current customer" of NAA is actually a current customer of any of the several life insurance companies who NAA producers have been appointed by to sell the company's products. The "current customers" have never contracted directly with the NAA and have not purchased anything directly from the NAA. The only customer transaction that has occurred is the customer's purchase of a life insurance policy from the insurance company that issued it and that was sold by a producer appointed by that company. Thus, the "current clients" in the "current client lead program" are not current clients (or current customers) of NAA at all.

26.    NAA is able to make the follow-up inquiries in the current client lead program because it has designed and maintained a system for processing applications for life insurance policies sold by NAA agents whereby every policy is routed through NAA before final submission to the insurance company whose policy is being sold. NAA, in effect, captures all of the customer's personal information by retaining a copy of the application. NAA then uses that personal

- 11 -

information to create a "current client lead." On the most basic level, NAA captures the customer's personal contact information as well as the identity of the insurance company whose product the customer had previously purchased and still owns. During these follow-up inquiries, NAA uniformly and deceptively represents to the current clients that their policy is "up for review" and informs them that an agent will be contacting them. Important to note is that NAA does not disclose to the current clients that it (NAA) is making the follow-up inquiry, rather than the insurance company who issued the policy. Nor does NAA disclose that NAA is or has been involved in any way with the client's purchase of life insurance. Nonetheless, once that call has been made successfully, the contact information for the customer is then deemed a "current client lead" and is made available for NAA producers to purchase or acquire.

27.    In fact, NAA requires affiliated producers to purchase these "current client leads." NAA maintains the current client lead program in a manner that ensures that it distributes these leads to producers other than the producers who first sold the insurance policy to the customer. This is done in part by targeting the clients of the producers who become unaffiliated with NAA (i.e., who cancel or do not renew their affiliation with NAA). Nevertheless, NAA also includes clients of affiliated NAA producers in the current client lead program.

28.    NAA's system for creating and using current client data is still more complex. In addition to the customer's basic contact information, NAA also retains and uses the customer's confidential health and financial information included in the earlier application for insurance for the purposes of creating the "current client lead." Specifically, NAA systematically and uniformly trains its agents to use the customer's confidential health and financial information (now made part of the current client lead) in the sales presentation for the replacement policy to deceptively represent that a replacement is appropriate because, based on the

- 12 -

CLASS ACTION COMPLAINT

confidential health and financial information, the original policy is purportedly unsuitable.

29. NAA did not and does not seek or acquire written authorization from clients or customers allowing NAA to retain and use the personal and/or privileged information.

30. Foresters knows, or should know, that NAA is capturing, retaining and disclosing customers' personal and privileged information in this manner and for improper and unauthorized purposes. Foresters condones and ratifies NAA's conduct.

31. The use of clients' personal and privileged information as described is done in violation of California law, including but not limited to Cal. Ins. Code Sections 791.03, 791.13, and/or 791.06.

32. In addition to use of the customer's personal and privileged information, NAA also systematically and uniformly trains its producers to sell replacement policies to the current client, through whatever means necessary, including making any of several stock misrepresentations to the current client:

  a. about the prior insurance agent, such as misrepresenting that the producer has relocated or cannot be located, and/or that the producer is no longer affiliated with the insurance company whose product was originally sold, and/or the prior producer was not a good agent or fit for the business, and/or that it is unknown if the prior producer is still licensed to sell insurance; and/or

  b. that the credibility of the original insurance company is in question, such as informing the customer that company is distressed or is, in some way, inferior to the company whose product is being sold as a replacement; and/or

CLASS ACTION COMPLAINT

c.  that there is a problem with the original policy that warrants its replacement.

33.  NAA producers adhere to the training and supervision provided by NAA and carry out the churning scheme in a systematic manner.

34.  As part of its churning scheme, NAA developed a practice of telling producers purchasing current client leads to forego preparing replacement forms or otherwise noting that the policy is a replacement. Instead, the producers are instructed to simply cancel the original policy and submit a new application for a new policy. This is done, in part, so that the original producer will not find out that NAA has manufactured and sold a current client lead on one of the producer's customers.

35.  These unfair, deceptive and illegal practices are harmful, in part, because the customer has no insurance in the interim while the new application is pending, the premium for the new policy will likely be higher because the customer is older, additional administrative expenses and costs of the new policy negatively affect the value to the customer, and when the replacement policy issues, the issuance causes the reset of a new contestability period (typically two years) wherein the insurance carrier does not have to pay for death due to certain causes, and the insurance carrier has the right to investigate and contest death due to other causes.

36.  These practices by NAA are contrary to California's laws and insurance regulations (including but not limited to Cal. Ins. Code Sections, 780, 781, 791.03, 791.13, and/or 791.06, *et seq., * Cal. Bus. & Prof. § 17200, *et seq*., and Cal. Bus. & Prof. § 17500, *et seq*.), as well as the rules and policies of many, if not all of the insurance carriers with whom NAA does business. The practices were designed to, and have resulted in, the unlawful churning of insurance policy-

- 14 -

CLASS ACTION COMPLAINT

holders' insurance policies throughout California, as well as the illegal use of consumers' private and privileged information.

### Proposed Class Representative Mr. Ritter's Transactions

37.     Plaintiff Dallas Ritter's transactions and experiences with Defendants' churning scheme are representative of those of the remainder of the putative class. Plaintiff was a victim of the unlawful marketing and sales practices discussed in detail above.

38.     Specifically, on or about February 17, 2014, Plaintiff Ritter completed an application for a Foresters life insurance policy.

39.     Andrew Taylor was the producer who sold the policy to Plaintiff Ritter. Taylor was an NAA producer and was appointed by Foresters to sell its life insurance products in California.

40.     As part of the application process, Plaintiff Ritter provided personal and privileged information. Taylor completed the application. The application and information provided was provided by Taylor to NAA as he was instructed and required to do by NAA.

41.     As described above, NAA retained a copy of the information before forwarding it on to Foresters.

42.     Plaintiff Ritter did not consent to nor authorize NAA to retain his personal and privileged information. Nor did he authorize NAA to later use his information for any purpose.

43.     Soon thereafter, Foresters issued a Foresters PlanRight life insurance policy with an insurance amount of $35,000. Plaintiff Ritter paid monthly premiums of $212.04 for the insurance until June 2014.

44.     During the interim between February and June, Taylor became unaffiliated with NAA, although he remained an appointed agent of Foresters.

- 15 -

CLASS ACTION COMPLAINT

45. On or about June 25, 2014, Plaintiff Ritter was contacted by Steven E. Mical. Like Taylor, Mical was appointed by Foresters to sell its life insurance products in California and was an NAA producer.

46. At the direction, supervision and control of NAA, and consistent with the training he received as part of NAA's churning scheme, Mical informed Plaintiff Ritter that the Foresters life insurance sold to him by Taylor was inferior and unsuitable for his needs. This determination was based either in whole, or in part, on the personal and privileged information Mical obtained in the form of a "current client lead." The "current client lead" was provided to Mical by NAA because Taylor had become unaffiliated with NAA and because NAA wanted to deprive Taylor of any future commissions on the Foresters policy he had sold to Plaintiff Ritter. NAA also had Mical churn Plaintiff Ritter so a new business commission would be earned on the replacement policy.

47. Consistent with his training, Mical directed Plaintiff Ritter to cancel the Foresters policy and assured him that another policy that was better and more suitable than the Foresters policy could be obtained and would save Plaintiff Ritter money. This misrepresentation was one NAA producers were uniformly encouraged to use in the churning scheme.

48. Plaintiff Ritter cancelled the Foresters policy based on the misrepresentation.

49. Mical completed an application for another life insurance policy with Mutual of Omaha, but that application was rejected. A second attempt was also rejected.

50. Mical ultimately submitted a new application for Plaintiff Ritter to Foresters. Again, as part of the application process, Plaintiff Ritter provided personal and privileged information. Mical completed the application for Plaintiff Ritter's signature. The application and information was provided by Mical to NAA.

- 16 -

CLASS ACTION COMPLAINT

51.   As described above, NAA again retained a copy of the information before forwarding it on to Foresters.

52.   Notably, in the application, and as described above, Mical indicated that the insurance applied for was not replacing, reducing coverage or modifying premiums paid for any existing life insurance.

53.   On or about June 26, 2014, Foresters issued its second policy in less than six months to Plaintiff Ritter. Unlike the first policy, however, the second had an insurance amount of only $30,000 and a monthly premium of $192.33. The reduced amount of insurance was necessary because Foresters would not issue a $35,000 policy with a monthly premium of $212.04. Because of the churning scheme, Plaintiff Ritter ultimately received less insurance. Additionally, the policy Plaintiff ended up with was priced more expensively than his original policy (i.e., the $35,000 policy cost $6.06 (monthly) per $1,000 in coverage and the $30,000 policy cost $6.40 (monthly) per $1,000 in coverage).

54.   Plaintiff Ritter paid the monthly premium to Foresters who accepted it. In so doing, Foresters ratified and condoned the conduct of NAA, and Mical.

55.   Moreover, Foresters deliberately maintained (and continues to maintain) an underwriting process that allows NAA's churning scheme to go on. Specifically, Foresters knows NAA producers routinely use its products to wrongfully replace other companies' policies, but turns a blind eye to the pervasive churning. Plaintiff Ritter's case illustrates the point dramatically because here a Foresters policy was not only being used as the replacement policy, it was a Foresters policy that had been sold to Ritter less than six months earlier and that had been cancelled as part of the churning scheme. Had Foresters maintained appropriate safeguards either though underwriting or by tracking persistency in a more meaningful way, the NAA churning scheme would have likely been disabled.

CLASS ACTION COMPLAINT

56.     Mical later contacted Plaintiff Ritter to apologize for his actions. Mical also informed the Plaintiff that he had been instructed by his superiors at NAA to do everything he did with regard to contacting the Plaintiff in the first place and in replacing Plaintiff Ritter's original policy.

## FIRST CAUSE OF ACTION

## UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES

### (Cal. Bus. & Prof. § 17200, et seq.)

57.     Plaintiff adopts, re-alleges and incorporates herein each and every allegation in Paragraphs 1 through 56, as though fully set forth herein.

58.     Plaintiff brings this claim individually, on behalf of the class and on behalf of the general public.

59.     Through the conduct and scheme described herein, and particularly through the marketing and selling of Foresters life insurance policies to Plaintiff and members of the public, Defendants engaged in unlawful, deceptive, and unfair business acts within the meaning of California Business and Professions Code § 17200 et seq. Defendants' acts and practices offend an established public policy, and Defendants engage in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers including Plaintiff.

60.     The Defendants', as well as their agents', acts of unfair competition and unlawful business practices include violations of Cal. Ins. Code Sections, 780, 781, 791.03, 791.13, and/or 791.06, *et seq.*, California Civil Code §§1572 (actual fraud), 1573 (constructive fraud), 1709 (deceit), 1711 (deceit to defraud public or class), California Insurance Code §§ 330 - 332 (concealment), 350-361 (representations), other portions of the California Insurance Code and related regulations and rules, including 10 CCR § 2547.4 (advertisement of life insurance), and the common law. Such acts include, but are not limited to

- 18 -

a. maintaining and systematically carrying out a life insurance churning scheme;

b. misrepresenting the need for replacement of life insurance policies;

c. making statements that were known, or should have been known, to be a misrepresentation to a policyholder in any insurer for the purpose of inducing or tending to induce him or her to lapse, forfeit or surrender his or her insurance therein;

d. making any representation or comparison of insurers or policies to an insured which was misleading, for the purpose of inducing or tending to induce the insured to lapse, forfeit, change or surrender his or her insurance;

e. using or authorizing the use of pretext interviews to obtain information in connection with an insurance transaction;

f. disclosing any personal or privileged information about an individual collected or received in connection with an insurance transaction without proper authorization;

g. omitting the truth, and specifically the true reasons for the replacement of the policies at issue; and

h. omitting and suppressing that NAA was operating a churning scheme for its own benefit and to the detriment of the Plaintiff and class.

61.    Plaintiff reserves the right to allege other violations which constitute other unlawful business acts or practices. Upon information and belief, Defendants' wrongful conduct in violation of § 17200, *et seq.* is ongoing and continues to this date.

- 19 -

CLASS ACTION COMPLAINT

62.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

63.    The Defendants treated the Plaintiff and members of the class unfairly.

64.    Defendants' actions, claims, nondisclosures, and misleading statements, as alleged in this Complaint, are likely to deceive Plaintiff and the public, and were intended to deceive Plaintiff and members of the public. Plaintiff and class members have in fact been deceived and have relied on Defendants' representations and omissions. This reliance has caused harm to Plaintiff and class members. Plaintiff and class members have suffered injury in fact, have been disadvantaged and have lost money as a result of Defendants' unlawful, unfair, and deceptive practices.

65.    As a result of their unfairness and deception, Defendants have been able to reap unjust revenue and profit.  Restitution is, therefore, appropriate and the Plaintiff asks that Court order restitution. Further, upon information and belief, unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

## SECOND CAUSE OF ACTION
## UNFAIR, DECEPTIVE AND MISLEADING ADVERSTISING
### (Cal. Bus. & Prof. § 17500, et seq.)

66.    Plaintiff adopts, re-alleges and incorporates herein each and every allegation in Paragraphs 1 through 56, as though fully set forth herein.

67.    Plaintiff brings this claim individually, on behalf of the class and on behalf of the general public.

68.    Through the conduct and scheme described herein, and particularly through the Defendants' scheme carried out for the replacement of life insurance policies to Plaintiff and members of the public, Defendants engaged in unfair,

- 20 -

CLASS ACTION COMPLAINT

deceptive, and misleading advertising within the meaning of California Business and Professions Code § 17500 et seq. Defendants' acts and practices offend an established public policy, and Defendants engage in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers including Plaintiff.

69.    Defendants' acts of unfair, deceptive, and misleading advertising include violations of, Cal. Ins. Code Sections, 780, 781, 791.03, 791.13, and/or 791.06, *et seq.*, California Civil Code §§1572 (actual fraud), 1573 (constructive fraud), 1709 (deceit), 1711 (deceit to defraud public or class), California Insurance Code §§ 330 - 332 (concealment), 350-361 (representations), other portions of the California Insurance Code and related regulations and rules, including 10 CCR § 2547.4 (advertisement of life insurance), and the common law. Such acts include, but are not limited to:

a. maintaining and systematically carrying out a life insurance churning scheme;

b. misrepresenting the need for replacement of life insurance policies;

c. making statements that were known, or should have been known, to be a misrepresentation to a policyholder in any insurer for the purpose of inducing or tending to induce him or her to lapse, forfeit or surrender his or her insurance therein;

d. making any representation or comparison of insurers or policies to an insured which was misleading, for the purpose of inducing or tending to induce the insured to lapse, forfeit, change or surrender his or her insurance;

e. using or authorizing the use of pretext interviews to obtain information in connection with an insurance transaction;

CLASS ACTION COMPLAINT

    f.  disclosing any personal or privileged information about an individual collected or received in connection with an insurance transaction without proper authorization;

    g.  omitting the truth, and specifically the true reasons for the replacement of the policies at issue; and

    h.  omission and suppression of the fact NAA was operating a churning scheme for its own benefit and to the detriment of the Plaintiff and class.

70. Plaintiff reserves the right to allege other violations which constitute other unlawful business acts or practices. Upon information and belief, Defendants' wrongful conduct in violation of § 17500. *et seq*. is ongoing and continues to this date.

71. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

72. Defendants' actions, claims, nondisclosures, and misleading statements, as alleged in this Complaint, likely to deceive Plaintiff and the public, and were intended to deceive Plaintiff and members of the public. Plaintiff and class members have in fact been deceived and have relied on Defendants' representations and omissions. This reliance has caused harm to Plaintiff and class members. Plaintiff and class members have suffered injury in fact and lost money as a result of Defendants' unlawful, unfair, and fraudulent practices.

73. As a result of their deception, Defendants have been able to reap unjust revenue and profit. Restitution is, therefore, appropriate and the Plaintiff asks that Court order restitution. Further, upon information and belief, unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

- 22 -

CLASS ACTION COMPLAINT

## REQUEST FOR JUDGMENT

74.    Plaintiff asks for judgment against Defendants and each of them, in favor of the Plaintiff and the putative class as follows:

   a.  For an order certifying this action as a class action;

   b.  For actual and compensatory damages in such amount as the Court or jury deems just and proper;

   c.  For attorneys' fees and costs for all causes of action alleged herein for which such amounts are permissible under applicable law, including California Code of Civil Procedure § 1021.5, and in such amount as the Court or jury deems just and proper;

   d.  For prejudgment interest;

   e.  For an order requiring Defendants to provide notice to the class and to pay for such notice;

   f.  For imposition of a constructive trust, recessionary relief, injunctive relief, including prohibition of Defendants' unfair, illegal and fraudulent business practices set forth herein, and including restitution and disgorgement of ill-gotten profits; and

   g.  All other relief which the Court and/or jury deems equitable and just.

## DEMAND FOR JURY TRIAL

75.    Plaintiff on his own behalf and on behalf of the putative class, demands a jury trial in the above captioned matter.

DATED:  December 22, 2015.

/s/ *Nicholas W. Armstrong*_____
Nicholas W. Armstrong (Bar No. 270963)


PRICE ARMSTRONG, LLC
24121 2nd Avenue North, Unit 1
Birmingham, Alabama  35203
Tel:  (205) 208-9588
Fax: (205) 208-9598
Email: nick@pricearmstrong.com

*Attorney for Plaintiff*

CLASS ACTION COMPLAINT